Michael ROSEN, et al., Plaintiffs,

v.

**TENNESSEE COMMISSIONER OF FINANCE AND ADMINISTRA-TION, Defendant.**

No. 3:98–0627.

United States District Court,
M.D. Tennessee,
Nashville Division.

Oct. 24, 2001.

George Gordon Bonnyman, Jr., Tennessee Justice Center, Inc., Nashville, TN, for plaintiffs.

Jennifer Helton Hann, Katherine Anne Brown, Linda A. Ross, Sue A. Sheldon, Office of Atty. Gen., Nashville, TN, Ronald W. McNutt, Mitch Grissim & Associates, Nashville, TN, Charles A. Miller, Julie L.B. Johnson, Robert D. Wick, Covington & Burling, Washington, DC, for defendant.

Michael James Passino, Lassiter, Tidwell & Hildebrand, Nashville, TN, for special master.

## *MEMORANDUM*

HAYNES, District Judge.

Plaintiffs, Michael Rosen, Barbara Huskey, Emanuel Martin, by his next friend, Cheryl Martin; Wanda Campbell, Connie Hoilman, Mark Hughes, Jacob B., by his next friend, Martin B.; Jackie Baggett, Brenda Clabo and Pradie Tibbs, filed this action under 42 U.S.C. § 1983 against the Defendant, the Tennessee Commissioner of Finance Administration, asserting claims that the Commissioner's administration of Tennessee's TennCare plan, a managed health care program established under Title XIX of the Social Security Act, 42 U.S.C. 1396 *et seq.*, violates Plaintiffs' procedural rights under the Due Process Clause of the Fourteenth Amendment and

applicable federal regulations. This class action is on behalf of all past, present and future applicants, including Medicaid recipients, insured and uninsurable applicants who seek medical coverage under TennCare's program. Extensive discovery was taken in this action. Other significant aspects of this litigation are discussed *infra*.

Before the Court is the Plaintiffs' motion for a preliminary injunction to bar the Defendant's implementation of his October, 1, 2001 amendment to the TennCare plan to exclude uninsurables from its medical coverage. (Docket entry No. 204). Plaintiffs contend, in essence: (1) that the Defendant's October 1st amendment to the TennCare plan was not reviewed by a Medical Care Advisory Committee, as required by federal Medicaid regulations; (2) that the Defendant's amendment to TennCare also breaches the parties' Settlement Agreement and Agreed Order in this action to maintain TennCare's current program design; (3) that the Defendant's amendment deprives the Plaintiffs of the benefits bargained for and contemplated in the parties' Settlement Agreement; and (4) that the Defendant failed to give the requisite prior notice of this Plan amendment, as required by the parties' Settlement Agreement.

In response, the Defendant argues, in sum: (1) that Plaintiffs lack standing to challenge its new amendment to the Tenn-Care program; (2) that the Agreed Order provides only procedural protections and does not bar unilateral substantive changes to TennCare's plan; (3) that the notice requirements in the Agreed Order and Settlement Agreement apply only to procedural changes; (4) that the TennCare Plan for uninsurables is not subject to federal regulations requiring review by a Medical Care Advisory Committee; (5) that if applicable, Plaintiffs cannot enforce this regulation; (6) that the TennCare pro-

gram has serious financial difficulties and the State cannot be limited in its policy decisions absent a clear agreement to do so; (7) that acute care remains available for uninsurables through other public and private health programs; and (8) that the Eleventh Amendment bars this action.

The Court earlier granted Plaintiffs' application for temporary restraining order on this Plan amendment (Docket Entry No. 217) and after a hearing on the motion for preliminary injunction, the Court awarded a provisional preliminary injunction to extend the temporary restraining order until a decision on the preliminary injunction issues. (Docket Entry No. 237). For that injunction, the Court adopted its findings in the Temporary Restraining Order and also found that the Defendant violated the notice requirements of the parties' Settlement Agreement. *Id.* The Defendant requested expedited consideration of the preliminary injunction issues. The Defendant has since filed a motion to stay any injunction in this action pending an appeal. (Docket Entry No. 247).

For the reasons set forth below, the Court concludes first that Plaintiffs possess standing to challenge the Defendant's October 1st policy, as class representatives and as parties to the Settlement Agreement and Agreed Order. Further, Plaintiff Clabo who remains a potential future applicant for coverage under TennCare, also has standing to challenge this policy. Second, the Court concludes that Medicaid statutes and regulations can be enforced by enrollees and applicants for enrollment in a Medicaid Waiver Plan. Third, the Defendant did not honor Medicaid's regulations' requirement to consult a Medical Advisory Committee in adopting its October 1st policy, despite a prior ruling of this Court that such consultation was a "clear" and "mandatory" requirement. Fourth, the Agreed Order and Settlement Agree-

ment, when construed together, required the Defendant to provide Plaintiffs thirty (30) days prior notice of any change in TennCare's "program design" and "policies." The Defendant did not provide such notice for its October 1st amendment. Fifth, under the Supremacy Clause of the federal constitution, the Court's prior Orders that awarded relief for violations of Plaintiffs' procedural rights and substantive entitlements to TennCare coverage and those Orders cannot be superceded by the October 1st rule changes. Sixth, the Eleventh Amendment does not bar this action seeking injunctive relief against a state official alleged to be violating a federal law. Class members who are uninsurable will be irreparably injured by this October 1st policy that would result in loss of medical care and medications necessary for their serious medical problems. Thus, a preliminary injunction should issue as well as the appointment of a Special Master. Finally, the facts of this case do not warrant a stay of this injunction pending an appeal.

## A. FINDING OF FACT

### 1. The Origin and Development of TennCare

On November 18, 1993, the Tennessee Commissioner of Public Health received approval of the State's application for its "TennCare" plan from the Administrator of the Health Care Financing Administration ("HCFA") in the United States Department of Health and Human Services. (Docket Entry No. 230, Defendant's Memorandum, Attachment No. 2 thereto). The TennCare plan was a "waiver-only demonstration" that was subject to "special terms and conditions". The purpose of the TennCare plan was to provide medical benefits not only to Medicaid recipients, but also to persons who were not covered under Title XIX.

Under the authority of section 1115(a)(2) of the SSA, expenditures made by the state for fee terms identified below (which are not otherwise included as expenditures under section 1903) shall, for the period of this project, be regarded as expenditures under the states title 19 plan

vi. Expenditures which would otherwise be precluded by section 1903(F.) For eligibility groups:

+ those who are uninsurable because of pre-existing conditions; and

+ those who are uninsured.

*Id.* at Administrator's November 18, 1993 letter at p. 3. Among the "special terms and conditions", as pertinent here, was a paragraph 22 that reads as follows: "Tennessee will implement modifications to the demonstration by submitting revisions to the original proposal for the HCFA approval. The state shall not submit amendments to the approved state plan relating to the new eligibles." *Id.,* Attachment thereto at 7.

Initially, the TennCare plan had an enrollment cap of 1,300,000 enrollees that was later extended to 1,500,000. *Id.* at Attachment No. 3. Under the original plan, as the number of enrollees reached the enrollment cap, the Plan would limit the further enrollment of uninsureds. *Id.* As the HCFA announcement on TennCare explained:

The State is planning to cap enrollment at 1.3 million in the first year of the waiver, and 1.5 million in the following years. While enrollment will not be restricted for those currently eligible for Medicaid or the uninsurables, the cap on *total* enrollment may limit the number of uninsured served.

(Plaintiff's Exhibit No. 10, Attachment thereto) (emphasis added).

In a December 28, 1993 letter, HCFA declined to approve the State's proposed charge of $25.00 to "a TennCare enrollee" that used a hospital emergency room for non emergency care, citing a statutory prohibition for such a change in a waiver program. (Docket Entry No. 230, Defendant's Memorandum at Attachment No. 7).

In a letter to Mr. H. Russell White dated April 21, 1994, the Department of Health and Human Services stated that there would not be any waiver of applicable Medicaid regulations without express HCFA approval.

> It has come to our attention that attorneys for the State of Tennessee, acting on behalf of David L. Manning, Manny Martins, and you, in your official capacities, have taken the position in the context of litigation relating to the TennCare demonstration that certain portions of the Medicaid statute have been waived by implication as a result of our approval of the TennCare demonstration project. *The purpose of this letter is to make clear that we do not believe there is any merit to the concept of waiver by implication in connection with a section 1115 demonstration project, and moreover, that we have explicitly refused to waive the particular statutory provision in question.*

(Plaintiff's Exhibit No. 10 (emphasis added)).

After implementation of the TennCare plan, litigation arose over the disparate treatment of uninsured and uninsurables, as compared to Medicaid recipients. In response to a state inquiry, HCFA's Director of Office of Beneficiary Services issued a memorandum on June 17, 1996 concerning the State's request for policy clarification on the fair hearing rules for TennCare recipients. In a word, HCFA's response required uninsured and uninsura-

bles to receive such hearings and applied all Medicaid requirements to them.

> 4. We also have some technical questions. In the attachment containing the State's appeal policies, the instructions refer to non-Medicaid enrollees. However, no reference is made to Medicaid enrollees. What are the rights of Medicaid enrollees? In this context, the State should be reminded that *under the waiver those individuals who are in the expanded population are to be considered Medicaid beneficiaries for purposes of all Medicaid requirements not identified as inapplicable. The fair hearing requirements in section 1902(a)(3) and implementing regulations thus apply to both the expansion population and individuals who would be Medicaid eligible in the absence of the TennCare demonstration.*

(Docket Entry No. 234, Plaintiff's Supplemental Brief in Support of Preliminary Injunction, Attachment thereto) (emphasis added)

In a February 19, 1999 letter, George P. Smith, HCFA's Tennessee project officer, responded to a letter from a Tennessee Department of Health official requesting "to close enrollment to 'all or to any segment of [y]our waiver expansion population'", i.e., uninsureds and uninsurables. (Docket Entry No. 230, Defendant's Memorandum at Attachment No. 3). After defining who are the uninsurables and uninsured under TennCare, Smith reiterated that under the State's waiver plan, any restriction on enrollees was limited to enrollment of uninsureds. *Id.* As to any possible change to remove other enrollees, Smith required information and answers to several questions on the impact of such a change and further asserted HCFA's oversight responsibility for any such changes.

> I understand your desire to make the request as broad as possible. However,

in our oversight responsibility we have an interest in maintaining informed prospective authorization for changes in the demonstration under our purview. As you know, *changes of this magnitude require either a change in the demonstration authority or a change in the special terms and conditions and cannot be undertaken prior to our express authorization.* We also understand your desire for prompt review of this request and will work with you toward that end. However, *the scope of the changes you are requesting is significant and it is critical that we fully understand the need as well as the impact of the request on access to services, quality of services, and cost of effectiveness.*

*Id.* at p. 3 (emphasis added). Brian Lapps, TennCare's director responded to Smith that TennCare was reviewing the need for changes "to alter waiver eligibility criteria to re-opening the rolls" and stated "We may also request approval to make changes in the TennCare benefit structure." *Id.* at p. 2.

In January, 2000, the Governor of Tennessee formed and appointed a Commission on the Future of TennCare [1] to study the TennCare plan and to recommend changes. This Commission issued its Report on November 17, 2000 and from the Court's review, the Commission contemplated that TennCare's coverage would extend to uninsurables.

E. *Health insurance benefits should be provided through TennCare for:*

• people who are Medicaid-eligible, with a benefit package similar to that proposed in TennCare II

• people in need but not eligible for Medicaid *by the creation of the following products in place of the current*

*expansion of TennCare to the uninsured and uninsurable:*

(a) *TennCare Assist,* a premium assistance program to assist certain low-income Tennesseans to buy into employer-sponsored health care coverage, including family coverage, when it is available to them.

(b) *TennCare Standard,* a second TennCare product for individuals who do not have access to employer-sponsored health insurance coverage and/or individuals who are uninsurable form an underwriting standpoint. The benefits for this product should be comparable to those most frequently offered by employer-sponsored small group plans. Premium rates for TennCare Standard should be actuarially determined, with premiums on a sliding scale basis.

Defendant's Exhibit No. 9, Report on the Future of TennCare at p. 4 (emphasis added). The Commission also noted that despite federal limitations on the plan, "*not* accepting federal dollars would almost certainly result in inadequate health care for our most fragile Tennessee citizens— an unacceptable alternative." *Id.* at p. 2 (emphasis added).

On June 28, 2001, Thomas A. Scully, the Administrator of the Center for Medicare and Medicaid Services ("CMS"), the successor to HCFA, responded to several requests from state officials that among other things were "amendments pertain[ing] to closing enrollment to adults in the uninsurable eligibility category..." (Defendant's Exhibit No. 1). In his letter on these "amendments," Scully stated his contingent approval, in pertinent part:

---

1. At the preliminary injunction hearing, Mark Reynolds, TennCare's Director, conceded that there were not any labor or consumer representatives on this Commission, as required by the Medicaid regulations for a Medical Care Advisory Committee.

"Circumstances as warrant allowing the State the flexibility that may be necessary to safeguard the substantial expansion population already being cared for under the demonstration. *Therefore, we approve the State's request to close enrollment, if it becomes necessary, to new uninsurable adults who are not entitled to Medicaid,* as described in your letters of January 26, March 19, and April 1, 1999. As indicated in your March 19, 1999 correspondence, on individuals losing Medicaid eligibility will continue to be enrolled in the TennCare program if he or she reapplies as an uninsured or uninsurable member during a 60–day grace period."

*Id.* (emphasis added).

On September 28, 2001, the Defendant issued a statement for "Public Necessity Rules", stating, in part, as follows:

The Department of Finance and Administrators determined that, in recent months, there has been an extraordinary growth in the TennCare population and, in fact, TennCare is precipitously close to its 1.5 million enrollment cap. In order to stabilize the TennCare program and to minimize impact on current enrollees of the program by avoiding drastic reduction in services, the Department of Finance and Administrator has determined that it is necessary to take action by immediately implementing the measures set forth herein.

(Docket Entry No. 234, Defendant's Memorandum, Attachment 4 thereto at p. 2). These findings allowed these amended TennCare rules, excluding uninsurables, to be implemented "without prior notice or hearing." *Id.*

The rules changes under this declaration amended Tenn. R & R 1200–13–12.02(d) to read as follows:

(d) Effective October 1, 2001, enrollment of additional persons in the TennCare and TennCare Partners

Programs shall only be permitted to persons who

1. Would have been Medicaid eligible under the Medicaid program as it was administered during fiscal year 1992–93 pursuant to 1200–13–12–.02(4)(a)1; or

2. Are persons losing Medicaid eligibility for TennCare who have no access to insurance if determined to meet the non-Medicaid eligibility criteria pursuant to 1200–13–12–.02(2)(b); or

3. Are uninsured children pursuant to 1200–13–12–.02(4)(a)5 and 1200–13–12–.02(4)(a)6; or

4. Are uninsurable children under age nineteen (19) who are 'uninsurable' as defined in the rule 1200–13–12–.01.

This provision constitutes a closure of enrollment for all other applicants and supercedes any other rule provision indicating that enrollment is open for such applicants.

(Docket Entry No. 230, Defendant's Memorandum, Attachment No. 4 thereto at p. 4).

### 2. The Impact of the October 1st Policy on Uninsurables

For the preliminary injunction hearing, Mark Reynolds, TennCare's director, explained in his affidavit that "[t]hrough the end of the state fiscal year ending on June 30, 2002, the projected expenditure of state dollars on TennCare exceeds the funds appropriated by the state legislature by approximately $37.5 million." (Docket Entry No. 232, Reynolds' Affidavit at ¶ 8). Under TennCare's waiver conditions, the TennCare plan must be "budget neutral" that requires, in these circumstances, either a change by the federal government on how much TennCare should spend or an appropriation from the state legislature

or enrollment or program cuts. *Id.* at ¶¶ 9 and 10. Reynolds states that it is his understanding that additional state appropriations are "unlikely." *Id.* at ¶ 10. In Reynolds' view, closure of enrollment to uninsurables is appropriate because generally this group is not covered by Medicaid; children are not affected by the amendment; adults who qualify for Medicaid remain covered; and disabled individuals can seek medical coverage under the Social Security disability program. *Id.* "Most health care providers will provide acute care regardless of the patient's ability to pay." *Id.* at ¶ 11. Further, TennCare's coverage of uninsurables has caused or encouraged "contraction of the private health insurance market." *Id.* at ¶ 13.

Of the estimated $37.5 million costs overrun[2], the costs associated with coverage of uninsurables is $7.5 million. *Id.* at ¶ 12. Before a state legislative committee hearing on these amendments, Reynolds described the impact of the Defendant's proposed policy, including this policy change on uninsurables, and stated that these amendments "will reduce the [Tenn-Care] rolls by 180,000 people." Plaintiff's Exhibit No. 2. Tennessee would save $155 million in state expenditures, but would lose $435 million in federal funds for the TennCare program. *Id.* On cross-examination, Reynolds conceded that the Tennessee Commissioner of the Department of Mental Health estimated that proposed policy changes would cost her agency $50 to $100 to $300 million in additional state funds. Uninsurables pay a premium under TennCare and Reynolds conceded that in some limited circumstances, the State enjoys a financial benefit in federal funding by extending coverage to uninsurables.

Reynolds explained that in other states, a Medical Care Advisory Committee (MCAC) is not consulted on policy or coverage changes, instead only on the types of care and medical care services to be provided by a State plan. *Id.* at ¶ 15. The factual basis for Reynolds' opinion about the role of MCACs in other states was not provided.

At the hearing in this Court, Reynolds explained that there are substitute services available for uninsurables who lose TennCare medical coverage. For example, Medicaid coverage is available for uninsurables who meet Social Security's disability requirements. There is a "spend down" program in the federal Medicaid program in which the patient must have medical expenses that leave the person with only $231 in income to cover nonmedical expenses. The federal government has a Ryan White fund to aid HIV and AIDS patients by providing medications. Pharmaceutical companies provide some scholarship assistance for needy patients requiring medications. The evidence also revealed a state renal program, but its maximum benefit is $120 a month. In the State's proposed long-term changes, Reynolds stated that uninsurables may be considered for coverage again at some point in the future, but under medical standards for coverage.[3] These latter proposed policies are subject to review by CMS and the Tennessee General Assembly. In the interim, Reynolds believes these substitute services would adequately cover these uninsurables.

---

**2.** The Court notes that the method or basis to determine the estimated $37.5 million cost overrun was not provided.

**3.** In *Hamby v. Menke,* No 3:98–1023 (M.D.Tenn. Memorandum and Order filed April 13, 2001), that is on appeal, this Court found that the Defendant's exclusive reliance upon an insurer's turndown letter to extend coverage to uninsurables created an impermissible irrebuttable presumption that denied such applicants their due process rights in the denial of their applications.

At the hearing on the motion for preliminary injunction, the Plaintiffs' proof focused primarily on the impact of this policy change on uninsurables and on the limitations and inadequacies of the cited substitute sources for health care coverage for uninsurables who are in constant need of immediate medical care and sustained medications. The Plaintiffs' witnesses included two physicians, two health services administrators and several uninsurables who have TennCare coverage.

Of the physician witnesses, Dr. Stephen Raffanti treats individuals with HIV and AIDS and his agency serves 3700 patients. Each year, Dr. Raffanti receives about 300 new patients with these illnesses. In Dr. Raffanti's experience, after contracting HIV, none of his patents could obtain private insurance. TennCare enables his patients to receive necessary medications for HIV to deter the development of full blown AIDS. These medications provide early treatment and prolong the lives of his patients. These medications cost $1,000 to $1,300 each month for each patient. If TennCare were closed to uninsurables who are or will be his clients, Dr. Raffanti opines that these persons are likely to develop full blown AIDS sooner and to have higher resistant levels to any medications for the latter stages of AIDS. In addition, the lack of these medications will increase the likelihood of transfer of the virus to others. As to other available programs, such as the Ryan White program that provides federal funds for these medications, Dr. Raffanti testified that the Ryan White program is not a viable option because this program has run out of funds for medications. In addition, eligibility determinations for other federal programs, such as Social Security disability, have a significant waiting period. That program is available only for full blown AIDS victims, when the medications cannot extend the patient's life. Some pharmaceutical companies have patient assistant programs to provide necessary medications, but those programs are based upon income.

Dr. James Powers, an internist who specializes in geriatrics, treats primarily indigent patients and seventy percent (70%) of his patients are uninsurables. Of these patients, thirty percent (30%) are on TennCare with the remainder having Medicare or Veteran's Administration coverage. In his experiences, medications are TennCare's major benefit to this group. Significant numbers of Dr. Powers' patients have heart problems, dementia, cancer or the effects of a stroke and need medications that are indispensable to their care and lives. The medications for these conditions can cost $500 a month and Medicare does not cover medications. In Dr. Powers' opinion, without TennCare, this group of patients is likely not to seek medical care and not to purchase necessary medications. Those patients with prescribed medications will ration their medicines to extend their availability. In addition, without TennCare, these patients are most likely to show up in emergency rooms of local hospitals requiring medical care that is much more costly than medications. Without medications, the prospect of nursing home care and rehabilitation services also will increase and those services are more costly than medications. According to Dr. Powers, the pharmaceutical companies that have scholarship programs for Medicaid require intensive paperwork, a deterrent to serving as a meaningful option. As to the accommodations of care at a private hospital, his hospital does not allow treatment of persons without some type of insurance coverage.

Of the other health services providers and administrators, Gretchen Watts, who has a masters in social work, treats patients with mental illnesses and four out of five of her patients are covered by Tenn-

Care. If TennCare were closed to these types of persons who are uninsurable, these persons could not afford the medications necessary for their treatment. In addition, Watts' husband, who has cancer, is on TennCare. Without TennCare coverage, Mr. Watts' medication, which costs $5000 per month, would be beyond his financial means and his life would soon end.

Donna Hampton, another social worker, assists persons needing dialysis treatments and expends about 40% of her time with TennCare applicants. Hampton assists these patients in reviewing their financial conditions and their medical expenses. Most of Hampton's clients are uninsurables and she receives three to four clients each month and has five clients awaiting a letter of uninsurability. For this group, medical costs average $330–$450 per month for medications, with some medications costing $800 a month. For the Medicaid spend-down program, for her clients to obtain these benefits would require several months of medical expenses to become eligible. Without TennCare, Hampton opined that most of her patients would not get necessary medications.

Amy Brown, a local program director with the National Multiple Sclerosis Society serves as an information source on various medical services, including Tenn-Care, available to Tennessee citizens with Multiple Sclerosis ("MS"). Physicians refer MS patients to Brown and she has about 2200 clients with MS in Middle Tennessee. Medications for MS can cost $1,000 per month. Most of her clients do not qualify for social security disability or Medicaid standards for coverage. Other private assistance programs do not provide symptomatic drugs for related MS conditions, such as depression.

David Grimes, a vice president of Cornerstone Community Mental Health Services, testified that his agency serves adults with serious and persistent mental illnesses ("SPMIs"). Most of his agencies' clients are from state mental health hospitals. Some are covered by TennCare that allows for continuous medical care by providing for their prescribed medications. Without TennCare, these clients will not get their medications, likely resulting in their re-hospitalization or incarceration.

Several witnesses, who were TennCare enrollees and applicants prior to October 1, 2001, testified that without TennCare, they could not have received or expect to receive the medical services needed for their serious physical and mental treatment needs. Without these benefits, they would suffer substantial physical and mental pain. See Testimony of Karen Potter, Diana Hay and Kelly Scott.

The Defendant submitted an affidavit that with three exceptions all class representatives are or were covered by Tenn-Care. (Docket Entry No. 233, Sharp Affidavit). Of the remaining three, Michael Rosen elected to end his TennCare coverage. The second is a child who is unaffected by the October 1st policy change at issue. The third, Brenda Clabo, was terminated from TennCare; and was informed of her right to reapply, but she did not respond and has not yet reapplied.

### 3. Prior Orders in this Action

In earlier proceedings, the Court granted Plaintiffs' second motion for a preliminary injunction, citing the lack of any response by the Defendant to the merits of the motion. (Docket Entry No. 27). Plaintiffs' first motion for preliminary injunction (Docket Entry No. 2) was denied as moot. (Docket Entry No. 27). The Court ordered reinstatement of TennCare coverage to all class members who were denied coverage without the benefit of due process. *Id.* In response, the State temporarily suspended termination of insured and uninsured enrollees. The Defendant

filed a motion for relief (Docket Entry No. 29), citing the parties ongoing settlement discussions that delayed their response to the preliminary injunction motion. (Docket Entry No. 29). On May 5, 2000, the Court granted that motion (Docket Entry No. 106) that had actually become moot. In the interim, on September 13, 1999, the Court granted a joint motion to modify the January 20, 1999 Order. (Docket Entry No. 53)

In the September 13, 1999 Order, the Defendant used its TennCare eligibility base of insured and uninsureds to notify and allow *Rosen* class members to re-enroll in TennCare without an eligibility review or payment of past premiums. *Id.* at p. 2. In a word, this Order allowed the State to substitute the prior notice procedure for immediate reinstatement of those persons affected by the Court's earlier Order. *Id.* at pp. 3–4. Under this Order, 14,994 class members re-enrolled. *Id.* Class members who did not respond, would receive a second notice, *id.* at p. 5, and notices of re-enrollment would be posted at public places. *Id.* Re-enrollment was reopened for sixty (60) days. *Id.* at p. 6. Further, by April, 2000, the Defendant agreed that enrollees who had lost Medical coverage and were not enrolled as uninsured or uninsurable, would be given notice of their rights to reapply as an uninsured or uninsurable or to have an administrative appeal of their earlier losses of coverage.

On April 28, 2000, Plaintiffs renewed their motion for preliminary injunction (Docket Entry No. 87) citing continuing violations of the Court's September 13, 1999 Order because none of the notices required by that Order had been mailed and the Defendant failed to provide due process requirements in the TennCare administrative appeal process. (Docket Entry No. 88). A state audit had documented these appellate deficiencies. Plaintiffs

also cited other instances of terminations of coverage without notice or receipt of notice after termination. In earlier proceedings, there was proof of reverification notices sent during one quarter in 2000 for 100,000 enrollees on their continued eligibility for TennCare coverage. (Docket Entry No. 144, Transcript of Proceedings, October 3, 2000 at pp. 12–17).

On May 5, 2000, Plaintiffs filed an application for a Temporary Restraining Order (Docket Entry No. 92), citing the Defendant's continuing violations of the Court's injunction and Plaintiffs' procedural due process rights. The Court granted the Plaintiffs' application for a temporary restraining order (Docket Entry No. 96), requiring compliance with 42 C.F.R. § 431, Subpart E before any termination or disruption of a class member's TennCare coverage

On September 7, 2000, Plaintiffs filed a motion to hold the Defendant in contempt because the notices required by the September 19, 1999 Order still had not been mailed. (Docket Entry No. 112). A hearing was held on October 2 and 3, 2000, on whether to issue the preliminary injunction and to hold the Defendant in contempt. Pending a decision, the prior Restraining Order was subsequently modified and extended by agreement of the parties. (Docket Entry No. 166). Before a decision, the parties engaged in negotiations and at the parties' request, the Court reserved consideration of the Plaintiffs' contempt motion. The parties then agreed to settle their remaining disputes and submitted an Agreed Order on March 7, 2001 that was entered on March 8th. (Docket Entry No. 171).

In the March 8th Order, the parties, in sum, agreed to allow uninsured class members the right to re-enroll in the TennCare program with revised procedures to address Plaintiffs' due process claims. For a

period of two years after the entry of the Order, the Defendant was required to file quarterly reports to document their compliance with the terms of the Order and the parties' settlement agreement. *Id.* at p. 11. The particular provisions of the Agreed Order at issue on this motion are discussed *infra.*

On July 27, 2001, Plaintiffs' filed a motion to enforce the March 8th Agreed Order (Docket Entry No. 184), asserting: (1) that the Defendant was imposing upon class members the financial requirement of payment of all past premiums to be reinstated with TennCare coverage and (2) that the Defendant was denying due process to class members with Serious and Persistent Mental Illness (SPMI) and Severely Emotional Disturbed Children (SEDC). The latter class members are applicants whom the Defendant referred to local community health centers to evaluate their eligibility. Class members were told by these local agencies that they lacked any process to perform their roles as facilitators of these persons' eligibility for TennCare coverage. These class members allegedly also did not receive adequate notice of TennCare coverage of mentally ill persons or were denied coverage with an inadequate statement of reasons for the denial and/or without citation to relevant law for the denial of coverage. The latter were cited as due process violations of federal regulations governing the TennCare program. In the earlier Agreed Order, the Defendant promised to abide by these regulatory due process requirements.

The pertinent portions of the Agreed Order that were the subject of Plaintiffs' motion to enforce were as follows:

1. *The defendant Commissioner of Finance and Administrations is preliminarily and permanently enjoined from terminating, reducing or suspending the TennCare coverage of members of the plaintiff class who are enrolled in the TennCare program, without affording such individuals notice and an opportunity hearing in accordance with 42 C.F.R. Part 431, Subpart E.* The defendant is further preliminarily and permanently enjoined from failing to afford such notice and opportunity for a hearing when the class members' application(s) for TennCare are denied.

\* \* \* \* \* \*

(a) Subject to the exclusions noted below, the defendant shall mail notices to all individuals, not currently enrolled, whose TennCare coverage was terminated at any time between July 11, 1998, and 60 days after the entry of this order. Issuance of the notice shall begin no later than 60 days after the entry of this order; and end by 120 days after the entry of this order; the distribution of mailings within that period shall be such that the average length of time for issuance of the mailings as a whole shall not exceed 90 days from the entry of this order. *Those notified shall include any individuals who lost Medicaid coverage during this period and never retained TennCare coverage.* Excluded from this notice requirement is any individual whose eligibility was terminated upon verification of his death, upon his written request, pursuant to an order entered by Administrative Law Judge, or pursuant to the policies or procedures appended to the agreed order entered February 9, 2001 (Docket Entry No. 166) [enrollees were incarcerated, have moved out of state, or have access to insurance]. *The notice will offer these former enrollees the opportunity to reapply for TennCare as a waiver eligible, with waiver of closed enrollment for uninsured adults. Recipients of the notice will be given 60*

*days within which to apply for reinstatement. Coverage will be effective the date the completed application is received by the TennCare Bureau.* Former enrollees who received this notice shall be informed that they may appeal to seek a coverage date retroactive to the date of the termination of their coverage, subject to the requirements that they established their eligibility as of the earlier date, and pay any premiums incurred between that date and the end of the period for which coverage is sought. *If the applicant for reinstatement is not currently eligible (except that closure of enrollment to uninsured adults will be waived), reinstatement be denied in conformity with the procedural safeguards contained in 42 C.F.R. Part 431, Subpart E.*

(Docket Entry No. 171, Agreed Order at pp. 2, 3–4) (emphasis added). There was also to be a "waiver of closed enrollment for uninsured adults." *Id.* at p. 3. In a word, there was to be reopening of TennCare for uninsured applicants.

After an evidentiary hearing, the Court granted the Plaintiffs' motion to enforce the Agreed Order. (Docket Entry Nos. 200 and 201). As a matter of law, the Court concluded that under Sixth Circuit precedent, the Agreed Order and Settlement Agreement must be construed to preserve the basic relief for which the Plaintiffs bargained. As pertinent here, the Court found that the Agreed Order was designed to provide a remedy for applicants who did not receive due process in their termination from TennCare. Further, the Court concluded that enforcement of the past premium rule completely foreclosed any meaningful remedy to these class members. This conclusion did not bar the Defendant's collection of past due premiums under its deferred payment policy for current TennCare enrollees. Further, the Court concluded that the De-

fendant's existing process for TennCare applicants with serious mental illnesses did not provide adequate notice in the application procedures to inform these class members of their coverage eligibility. The Defendant effectively denied these class members' applications and failed to comply with due process requirements set forth in the Agreed Order by providing inadequate statements of reasons for the denials and failures to cite the applicable law for the denials.

On the current motion for preliminary injunction, the pertinent provisions of the Agreed Order at issue involve the State's agreement to reopen enrollment to uninsured adults during finite enrollment periods under stated conditions

2. The State will reopen enrollment to uninsured adults during future enrollment periods. Reopening of enrollment is a time-limited commitment, through the expiration of the current waiver or any extension period of the current waiver under its *current terms and conditions and program design*, and not to extend beyond December 31, 2002.

(Docket Entry No. 171, Agreed Order at p. 3) (emphasis added).

In addition, Plaintiffs' asserted a breach of other provisions in the Settlement Agreement that was attached to the parties' joint motion to approve the settlement. The Joint Motion to approve the Settlement Agreement, signed by both parties on March 8th, 2001, also provides that the policy of reopening enrollment to uninsured adults *"is consistent with TennCare's original design and the state's longstanding goals for the program."* (Docket Entry No. 170, Joint Motion at p. 3) (emphasis added). Under the terms of the Settlement Agreement, the state and its consultants agreed to:

1) Conduct periodic monitoring of determinations of eligibility and processing of applications to ensure that TennCare's policies and procedures are followed;

2) Conduct periodic monitoring of the TennCare Information Line, including periodic undercover calls, to ensure that TennCare's policies and procedures are followed and correct information is communicated;

3) Conduct an operational review of the management information systems (MIS) to assess whether the automated processes produce outcomes in accordance with the policies and procedures governing the determination of eligibility for TennCare and whether the mandated notices are generated. In addition, an evaluation of the process of posting premium payments will be conducted;

4) Review administrative appeals filed to monitor the processing of appeals by the Administrative Appeals Unit to ensure that TennCare's policies and procedures are followed, and that appeal decisions are implemented . . .

*Id.* Attachment thereto, Settlement Agreement at p. 1, Section I(A) at ¶ 1–4.

The Plaintiffs also cited the Settlement Agreement that contains a section on future policies and procedural changes.

**F. Future Policy and Procedures Changes.**

1. *The defendant and his successors shall provide to plaintiffs' counsel any proposed changes in policies or procedures or any proposed new policies and procedures that could potentially affect the manner in which the State complies with the settlement agreement and court order in this case.* The defendant shall provide such changes or new policies and procedures to plaintiffs' counsel at least 30 days prior to their submissions to the Health Care Financing Administration for review and/or the initiation of rule making procedures for their promulgation, whichever comes first. Within 15 days of their receipt of a proposed change or new policy and procedure, plaintiffs' counsel shall provide the State with a written statement of their position concerning the proposal. Within the remaining period, the defendant and plaintiffs' counsel shall engage in good faith consultations with respect to any objections raised in writing by plaintiffs' counsel that the proposed changes or new policies and procedures potentially violate the injunction entered in this case. If proposed changes or new policies and procedures are developed under circumstances that fall within the scope of Tenn.Code Ann. §§ 4–5–208 or 4–5–209 (emergency or public necessity), the defendant shall give plaintiffs' counsel thirty days notice except in circumstances that to do so would jeopardize federal financial participation. In those cases, the defendants will provide the plaintiffs such notice as soon as is practicable.

(Docket Entry No. 170, Attachment thereto, Settlement Agreement at p. 3) (emphasis added).

**B. CONCLUSIONS OF LAW**

Of the parties' legal contention, the Court addresses first the Defendant's argument that Plaintiffs lack standing to challenge the Defendant's amendment to terminate uninsurable coverage of future applicants, the resolution of which could render moot the other issues.

**1. Standing**

■ Here, the Defendant presents proof that none of the named Plaintiffs is impacted by the October 1st policy decision to drop TennCare coverage of uninsurables. The Court defined the class in this action as "all present *and future appli-*

*cants* " for benefits under TennCare program. (Docket Entry No. 26, Court's Memorandum of January 20, 1999). Further, at the hearing, the physicians and health care administrators testified to the continuing source of persons who will apply for and will need TennCare benefits in the foreseeable future.

■■■ The threshold requirement for any civil action is a "case or controversy" under Article III of the Constitution asserted by a plaintiff who has standing to raise the issue. In determining whether a "case or controversy" exists and whether the named plaintiff has standing to complain, the Supreme Court stated in *Warth v. Seldin,* 422 U.S. 490, 508, 517–18, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975):

> We hold only that a plaintiff who seeks to challenge exclusionary zoning practices *must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention. Absent the necessary allegations of demonstrable, particularized injury, there can be no confidence of "a real need to exercise the power of judicial review"* or that relief can be framed "no broader than required by the precise facts to which the court's ruling would be applied."

\*　　\*　　\*　　\*　　\*　　\*

■■■ The rules of standing, whether as aspects of the Art. III case-or-controversy requirement or as reflections of prudential considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention. *It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.*

(citation and footnote omitted and emphasis added); *accord County of Riverside v.*

*McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) ("At the core of the standing doctrine is the requirement that 'a plaintiff [must] allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.' ") (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).

■■ This "threat of injury" must be both "real and immediate" not "conjectural" or "hypothetical." *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). As a general rule, standing should be determined as a preliminary matter through an examination of the facts at the time of the motion. *Haskell v. Washington,* 864 F.2d 1266, 1276 (6th Cir.1988). A potential exception may lie where the issues of standing and the merits are inextricably intertwined, *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 103 S.Ct. 2979, 2982–83 n. 5, 77 L.Ed.2d 605 (1983), or where the action involves a class under Rule 23. *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991).

Under class action precedents, consideration of the controversy can continue notwithstanding that the class representative may have achieved the relief at issue. *Sosna v. Iowa,* 419 U.S. 393, 403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). Since *Sosna,* in *Blum v. Yaretsky,* 457 U.S. 991, 996, n. 6, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), a class action on behalf of patients "who have been are or will be threatened or forced to leave their nursing homes and have their Medicaid benefits reduced or terminated," the Supreme Court stated that:

> It is axiomatic that the judicial power conferred by Art. III may not be exercised unless the plaintiff shows "that he personally has suffered some actual or threatened injury as a result of the puta-

tively illegal conduct of the defendant." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). It is not enough that the conduct of which the plaintiff complains will injure *someone.* The complaining party must also show that he is within the class of persons who will be concretely affected. Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigation conduct of another kind, although similar to which he has been subject. *Id.* at p. 999, 102 S.Ct. 2777, citing *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 166–167, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972).

Ultimately, in *Blum,* the Supreme Court held that "the threat of facility-initiated discharges or transfers to lower levels of care is sufficiently substantial that respondents have standing to challenge their procedural adequacy." *Id.* at 1000, 102 S.Ct. 2777. The Court, however, denied standing on transfers to higher care, citing the lack of personal threat by the named class representatives. *Id.* at 1001, n. 13, 102 S.Ct. 2777.

Since *Blum,* the Sixth Circuit has upheld classes that include future applicants. "We hold that the class in this case comprises all persons who do or *will assert* that they are applicants for credit under the [Equal Credit Opportunity Act]." *Barney v. Holzer Clinic Ltd.,* 110 F.3d 1207, 1214 (6th Cir.1997) (emphasis added).

Significantly, after *Blum,* in *Dixon v. Bowen,* 673 F.Supp. 123 (S.D.N.Y.1987), a class action was filed on behalf of a class of applicants for, or recipients of, social security disability benefits against the Secretary of Health and Human Services. The certified class included "all persons in New York who have filed *or will file applications for disability benefits* . . . and whose

benefits have been or will be terminated pursuant to the policies." *Id.* at 127 (emphasis added). The Defendant contended that the named plaintiffs, some of whom had yet to have their claims adjudicated, lacked standing to continue the action. The court held that there were plaintiffs who had standing to continue the suit and to represent the other class members, including the future applicants. *Id.* at 128.

In so holding, the Court in *Dixon* quoted *Blum* for the proposition that "one does not have to await consummation of threatened injury to obtain preventive relief." *Id.* at 127 (quoting *Blum,* 457 U.S. at 1000, 102 S.Ct. 2777). The court also stated:

"Inclusion in the class of those who apply for benefits after the entry of the preliminary injunction order protects applicants who would otherwise have to wait for the defendant's illegal application of the severity regulation to occur before they seek a post-hoc remedy. Such unnecessary harm and repetitive litigation is precisely what the class action devise is designed to prevent. Where the challenged 'practice is alleged to be continuing . . . the class properly includes future as well as past applicants who will be affected by it.' "

*Id.* at 128 (quoting *Kohn v. Royall Koegel & Wells,* 59 F.R.D. 515, 520 (S.D.N.Y. 1973)).

To understand the Defendant's standing argument here requires consideration of additional factual circumstances surrounding the implementation of the October 1st policy. On September 27, 2001 during an in-chambers conference requested by State's counsel to discuss the Defendant's compliance with the Court's September 14th Order, Defendant's Counsel disclosed the imminent announcement on September 28th of this prospective policy on uninsurables. (Docket Entry No. 219, at p. 4).[4]

---

**4.** The title page of this transcript is inaccurate as to the date of this Conference as reflected

This was the first disclosure of this policy change to Plaintiffs' counsel. Plaintiffs' counsel responded with his intention to file an application for a temporary restraining order on September 28th and a hearing was held. The October 1st policy was to be announced in the early afternoon of September 28th, but was not announced until after the Court issued the temporary restraining order (TRO) at 5:55pm on September 28th. (Defendant's Exhibit No. 10). Without the TRO, this policy would not have been announced until after the close of business on September 28th, a Friday. The policy would have been effective October 1, 2001, the following Monday. Thus, on October 1st, there would not be any legal entitlement for TennCare coverage for uninsurables to enable them to apply for any participation in the Tenn-Care program.

The Defendant's October 1st policy directly impacts not only future applicants who apply as uninsurables, but also those future applicants who may apply under remedial Orders of this Court. The Court understands *Blum* and the other cited cases to allow standing for threatened injury due to lowered levels of health care to present and future class members. Without injunctive relief on the October 1st policy, the future applicants who are uninsurable would not have a legal interest to assert. Thus, under these circumstances, the current plaintiffs' class counsel was the only one who could have effectively raised this issue. Of course, Plaintiff Clabo may be a future applicant, but Clabo could not have reapplied by September 28th, and under the October 1st policy she would not have any right to participate in TennCare. In the interim, class members entitled to relief under the Court's Orders would be ineligible. (Docket Entry No. 220, September 28, 2001 Hearing Transcript at pp. 60–61.). These class members would be irreparably injured, ie. foreclosed from necessary medical care.

For these reasons, under the post-*Blum* decisions, *Barney* and *Dixon*, the Court concludes that Plaintiffs' class representatives have the standing to enforce those agreements to secure injunctive relief. Plaintiffs, however, still must show irreparable injury to the beneficiaries of those agreements. In any event, aside from standing under the Medicaid Act, the class representative negotiated and executed the Agreed Order and the Settlement Agreement at issue. This Order and Agreement provide an independent basis to confer standing on the Plaintiff class members to challenge the October 1st policy as a breach of these agreements.

A related defense argument is that there is not an implied right of action to allow Plaintiffs to enforce Medicaid regulations, particularly MCAC requirement in this Section 1983 action.

■ Courts consider three factors when determining whether a statutory provision allows persons to file a private action to vindicate a federal right awarded under that statute. *See Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). First, "Congress must have intended that the provision in question benefit the plaintiff." *Id.* "Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence." *Id.* at 340–41, 117 S.Ct. 1353. "Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to

in its text that refers to the public announcement of this policy change "tomorrow evening." The policy change was announced on September 28, 2001. (Defendants Exhibit No. 10).

the asserted right must be couched in mandatory, rather than precatory, terms." *Id.* at 341, 117 S.Ct. 1353.

■ The Court concludes that the MCAC requirement passes the three tests for enforcement under Section 1983. In 42 U.S.C. § 1396a, Congress authorized the Secretary of the Department of Health and Human Services to grant waivers to states with plans approved by the Secretary. With this statutory authorization, Congress intended these benefits to extend to those persons covered under State plans that are approved by the Secretary, as reflected in HCFA's June 17, 1996 memorandum extending all Medicaid regulations to apply to these waiver eligibles. In gaining the Secretary's approval of TennCare, 42 U.S.C. § 1396a(a)(3) requires its procedural protection to extend to all TennCare recipients. The express purpose of Tenn-Care that the Secretary approved was to provide medical coverage to Medicaid recipients and to those individuals not covered by Title XIX. The coverage of these latter individuals was contemplated both by the State in submitting the waiver plan and by the HCFA in ultimately accepting the waiver. This conclusion is further strengthened by the correspondence between HCFA and state officials. Thus, the first requirement that the statute, as administered, was "intended to benefit plaintiffs" is satisfied here because the class action is on behalf of all past, present and future applicants, including Medicaid recipients, uninsured and uninsurable applicants who were covered or seek to be covered under TennCare.

Second, the requirement of a state to consult the MCAC is not "vague or amorphous." *See* 42 C.F.R. § 431.12. To the contrary, the federal regulation directs the state to provide for a MCAC that meets the requirements of the section. The regulation also instructs the state as to which issues it must consult the MCAC, namely

including those issues relating to health and medical care services, policy development, and program administration. See 42 C.F.R. § 431.12(a), (b) and (e). As discussed *infra,* this Court found this MCAC regulation to be "clear" and ordered the Defendant to follow it.

Third, the MCAC regulation places a binding obligation on the states and is couched in mandatory terms. As discussed, 42 C.F.R. § 431.12(a) states that "[a] state plan *must* provide for a medical care advisory committee ... to advise the Medicaid agency director about health and medical services." *Id.* (emphasis added). § 431.12(e) further provides that "the committee *must* have the opportunity for participation in policy development and program administration, including furthering the participation of recipient members in the agency program." (emphasis added). This Court has held the MCAC requirement to be "mandatory" in a § 1983 action by Medicaid enrollees. See e.g., *Jennings v. Alexander,* No. 80–2043–NE–CV (M.D.Tenn. Order and Memorandum filed September 3, 1980).

As to the Defendant's reliance on *Blessing v. Freestone,* 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), the Court deems this action to be distinguishable in that this statute provides a statutory scheme that confers procedural rights upon recipients that courts have consistently found to grant them implied rights to enforce its provisions. See *infra* at pp. 46–48. This is the type of determination by the District Court that the Supreme Court in *Blessing* required. 520 U.S. at 346, 117 S.Ct. 1353. This Court concludes that *Blessing* does not bar this Court's conclusion that the Plaintiffs have standing to enforce these Medicaid statutes and regulations at issue.

Thus, the Court concludes that an implied right of action exists under the Med-

icaid statues and regulations for covered enrollees to enforce the MCAC requirement under § 1983.

## 2. The Eleventh Amendment

The Court next addresses the Defendant's Eleventh Amendment defense to this action. The Defendant relies on *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (*"Pennhurst II* ), for the contention that "the Eleventh Amendment bars this Court from enforcing any such state law contractual obligation against the Defendant." (Docket Entry No. 230, Defendant's Memorandum In Opposition To Entry Of A Preliminary Injunction, at p. 13, n. 5).

 There are two constitutional bases upon which a State's Eleventh Amendment immunity from suit by a citizen in federal court can be abrogated: (1) under the Spending Clause, U.S. CONST. ART. 1, § 8, cl. 1. *Pennhurst State School v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) and (2) under Section 5 of the Fourteenth Amendment, U.S. CONST. AMEND. XIV, § 5, authorizing remedial legislation. *Fitzpatrick v. Butler,* 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). A state can also waive its sovereign immunity under the Eleventh Amendment. *Seminole Tribe v. Florida,* 517 U.S. 44, 63, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

In *Wilder v. Virginia Hospital Assn.,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), the Supreme Court discussed the 1975 amendment by Congress to the Social Security Act that required States to waive any Eleventh Amendment immunity from suit for violations of the Act, and its subsequent repeal. The Supreme Court noted that

Congress explained that it did not intend the repeal to 'be construed as in any way contravening or constraining the rights of the providers of Medicaid

services, the State Medicaid agencies, or the Department to seek prospective, injunctive relief in a federal or state judicial forum. Neither should the repeal of [the waiver section] be interpreted as placing constraints on the rights of the parties involved to seek prospective, injunctive relief.'

*Id.* at 517–18, 110 S.Ct. 2510. The Court also stated that "[i]ndeed, federal courts have continued to entertain such challenges since the passage of the Boren Amendment. All the circuits that have explicitly addressed the issue have concluded that the Amendment is enforceable under § 1983 by health care providers." *Id.* at 519, n. 16, 110 S.Ct. 2510. Under *Wilder,* the Eleventh Amendment does not bar this action.

As to *Pennhurst II* relied upon by the Defendant, that case involved an action against a state official seeking to compel that state official to enforce state law. This action is an action against a state official for violations of federal law. Moreover, the Sixth Circuit in *Futernick v. Sumpter Township,* 78 F.3d 1051, 1055 (6th Cir.1996), flatly rejected the contention that *Pennhurst* stands for the proposition that the Eleventh Amendment bars suit against a state official for the violation of a federal law. The Sixth Circuit stated:

"It is error to read the language about the 'party in interest' as an extension of the Eleventh Amendment immunity to actions seeking injunctive relief against a state officer who is violating federal law. To the extent the text of *Pennhurst* supports such a reading, it is overruled by *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). *Will* reaffirmed that state officers who are violating a federal law may *always* be sued for purely injunctive relief—'capacity' and 'party in interest' are irrelevant."

*Id.* (emphasis in original)(internal quotations omitted). The Court therefore finds that *Pennhurst II* is inapposite to this case.

For the foregoing reasons, and in light of the *Wilder* and *Futernick,* the Defendant's Eleventh Amendment defense is without merit.

### 3. Plaintiffs' claims under the Social Security Act

As a threshold matter, the Court recognizes that issues on allocation of public resources in federal benefit programs are matters reserved for the state and its elected representatives. In *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491, the Supreme Court explained

> In *King v. Smith,* [392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968)] we stressed the States' 'undisputed power,' under these provisions of the Social Security act, 'to set the level of benefits and the standard of need.' We described the AFDC enterprise as 'a scheme of cooperative federalism,' and noted carefully that '(t)here is no question that States have considerable latitude in allocating their AFDC resources, since each State is free to set its own standard of need and to determine the level of benefits by the amount of funds it devotes to the program.
> Congress was itself cognizant of the limitations on state resources from the very outset of the federal welfare program.

*Id.* at 478, 90 S.Ct. 1153.

■ Since *Dandridge,* the Supreme Court has articulated limitations on the State's otherwise considerable latitude in allocating resources under the Social Security Act. In *Jefferson v. Hackney,* 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972), the Supreme Court stated that "[s]o long as the State's actions are not in violation of any specific provision of the Constitution or the Social Security Act, appellants' poli-

cy arguments must be addressed to a different forum." *Id.* at 541, 92 S.Ct. 1724. The Supreme Court has also held that a state eligibility standard for welfare recipients that violates the Social Security Act is invalid under the Supremacy Clause of the Constitution. *See Townsend v. Swank,* 404 U.S. 282, 286 92 S.Ct. 502, 30 L.Ed.2d 448 (1971).

■ Courts have held that a state statute that violates a federal court order is invalid under the Supremacy Clause. In *Brinn v. Tidewater Transportation District Commission,* 242 F.3d 227 (4th Cir. 2001), the Fourth Circuit stated: "A state statute that thwarts a federal court order enforcing federal rights 'cannot survive the command of the Supremacy Clause.' " *Id.* at pp. 233–34 (quoting *Washington v. Washington State Commercial Passenger Fishing Vessel Assn.,* 443 U.S. 658, 695, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979)). In *Hook v. Arizona Dep't. of Corr.,* 107 F.3d 1397, 1402 (9th Cir.1997), the Ninth Circuit held that

> A state statute, however, need not directly violate the Constitution or a federal statute to be in violation of the Supremacy Clause. '[O]therwise valid state law . . . cannot stand in the way of a federal court's remedial scheme if the action is essentially to enforce the scheme'.

*Id.* at 1402 (quoting *Stone v. City and County of San Francisco,* 968 F.2d 850, 862 (9th Cir.1992)).

■ State regulations that violate a federal court order also have been held invalid under the Supremacy Clause. *West v. Lamb,* 497 F.Supp. 989 (D.Nev. 1980). In *West,* the District Court stated

> This court's order limiting population is of constitutional dimensions; it undercuts and enforces the inmate rights under the Constitution of the United States and will prevail, *any* constitution-

al provision, statue ordinance, *regulation* or judicial order of any court of the *state of Nevada*, or of any interim court thereof, *or of any ordinance, regulation, or order of any administrative body of any political subdivision of the State of Nevada*, to the contrary notwithstanding.

*Id.* at 1007 (emphasis added).

Here, there are three limitations on the Defendant's administration of the Tenn-Care program: (1) federal Medicaid regulations that impose requirements upon the Defendant's operation of the TennCare program; (2) the State's Settlement Agreement[5] with the Plaintiffs on how to operate its TennCare program; and (3) this Court's prior Orders that awarded relief to class members who are affected by this policy change.

### a. Medicaid's MCAC Regulations

 Plaintiffs contend that the Defendant's October 1st policy violates Medicaid regulations that require consultation with a Medical Care Advisory Committee ("MCAC") before implementation of a policy change in a State's Medicaid plan. 42 C.F.R. § 431.12, provides in relevant part, that

. . . . .

(b) State plan requirement. A state plan must provide for a medical care advisory committee meeting the requirements of this section to advise the Medicaid agency director about health and medical care services

. . . . .

(e) Committee participation. The committee must have opportunity for participation *in policy development and program administration*, including

furthering the participation of recipient members in the agency program.

*Id.* (emphasis added).

From the Court's analysis, the regulation establishing the MCAC serves the statutory requirement that "A state plan for medical assistance must—. . . (22) include descriptions of (A) the kinds and numbers of professional medical personnel and supporting staff that will be sued in the administration of the plan and of the responsibilities they will have . . . (D) other standards and methods that the State will use to assure that medical or remedial care and services provided to recipients of medical assistance are of high quality . . . [.]" 42 U.S.C.S. § 1396a(a)(22)(A)(D). Thus, the existence of a MCAC should be considered mandatory as an assurance that the State Plan will be conducted with "medical assistance of—high quality."

Here, 42 C.F.R. § 431.12(e) clearly requires MCAC's consultation and "participation in policy development." The late Honorable L. Clure Morton of this Court issued a temporary restraining order and injunction to prevent implementation of a Medicaid policy to reduce state reimbursement for services covered by Medicaid programs. *Jennings v. Alexander*, No. 80–2043–NE–CV (M.D.Tenn. Order and Memorandum filed September 3, 1980). Judge Morton found that a MCAC was never contacted or consulted when "it first became evident that reductions in expenditures were necessary." Memorandum at 9. Judge Morton observed that "[h]ad the MCAC been fully involved in considering the changes in the manner contemplated by the federal regulators, 42 C.F.R. § 431.12, solutions might well have been found which would have had a much less

---

5. Because the Defendant is sued only in his official capacity, the State is the real party in interest. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). A state can be held to honor its express agreements. See *Ford Motor Co. v. Dept. of the Treasury*, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945).

severe impact on the availability of services than do the regulators proposed." *Id.* at p. 8.

In granting injunctive relief due to the State's failure to consult a properly constituted MCAC, Judge Morton wrote:

> And while the state has the undeniably strong interest in confining Medicaid expenditures within the amount appropriated by the state legislature, [citing state statutes] that interest cannot justify the contravention of clear federal mandates to the resulting injury of Medicaid recipients.

*Id.* at p. 9–10.

Thus, this Court concludes that this MCAC regulation does apply to the "policy development" of the October 1st policy that clearly impacts "care and medical services" available to enrollees who are uninsurables. Further, as in *Jennings*, a properly constituted MCAC was not consulted on the October 1st policy. It is undisputed that the Commission on the Future of TennCare [6] was not a MCAC. Thus, the Court concludes that the Defendant's clear failure to consult a MCAC on this policy development adversely impacting future uninsurables, as required by 42 C.F.R. § 431.12(e), invalidates any attempt to effect this policy change.

The Defendant relies upon the Honorable John T. Nixon's 1994 ruling in *Daniels v. Tennessee Dept. of Public Health*, No. 79–3107 (M.D.Tenn. Memorandum date June 24, 1994), contending that Judge Nixon "held that a notice requirement imposed by federal Medicaid laws did not apply to waiver eligibles even though those individuals receive benefits similar to those provided by Medicaid." *Id.* at p. 10. Judge Nixon's ruling does not contain such a holding. In ruling on a TRO application, Judge Nixon stated only that

This Court is therefore skeptical that the TennCare waiver demonstration project is subject to the Medicaid plan statutes relied upon by plaintiffs. 42 U.S.C. §§ 1396a(a)(8) and 1396a(19) and 42 C.F.R. §§ 435.916 and 435.930. Accordingly, because at this time it does not appear that the uninsured and uninsurable coverage is provided for in the federal statutes and regulations, the Court finds that plaintiffs have failed to demonstrate a strong likelihood of success on the merits.

*Id.* at p. 9–10 (emphasis added). In fact, Judge Nixon later applied Medicaid statutes and regulations to uninsured and uninsurables in the same case. *Daniels v. Wadley*, 926 F.Supp. 1305, 1306, 1310–11 (M.D.Tenn.1996), *rev'd in part on other grounds*, 145 F.3d 1330 (6th Cir.1998)(unpublished).

In addition, HCFA's letter reflects its view that Medicaid regulations apply to the uninsured and uninsurables. The Defendant's entry into an Agreed Order to apply 42 C.F.R. § 431, Subpart E, setting forth its procedural requirements to the uninsured and uninsurables reflects the Defendant's concession that the Medicaid Act's regulations apply to this group of class members.

The Defendant argues that the MCAC regulation is limited to consultation on issues of issues of "health and medical services." See 42 C.F.R. § 431.12(a) and (b). Yet, 42 C.F.R. § 431.12(e) clearly mandates a MCAC's "participation in policy development." When subsection (a) and (e) are read together, the consultation obligation under § 431.12(e) applies to the Defendant's October 1st decision to not cover uninsurables because that decision is a "policy development" that clearly impacts

---

**6.** That Commission expressly contemplated coverage of uninsurables and cited the ad-

verse effects of any loss of any federal funds, as contemplated by this policy.

"health and medical services" available to uninsurables under the plan.

The Defendant's reliance upon *Georgia Hospital Assn. v. Dept. of Med. Assistance*, 528 F.Supp. 1348, 1355 (N.D.Ga. 1982) is misplaced because there, "the Court [found] that the Medical Advisory Committee, through the expanded Hospital Subcommittee had ample opportunity to advise the Department regarding the project." *Id.* Here, a MCAC does not exist and could not have been consulted. Further, the Defendant's argue that in *Georgia Hospital Assn.*, the Court ruled that "because the relevant Medicaid statute 'contains no requirement that a project must not impose additional changes on non-Medicaid or non-Medicare patients,'" that the Defendant's policy change state action was permissible. (Docket Entry No. 230, Defendant's Memorandum at p. 19, quoting *Georgia Hospital Assn.*). That Court actually noted that "the secretary lawfully waived this provision...compliance with it is irrelevant." *Id.* at 1357. In the Court's view, *Georgia Hospital Assn.* is factually inapposite.

In his post hearing submissions, the Defendant cites decisions of other Circuits that the MCAC regulation is not judicially enforceable, particularly where HCFA or its successor CSM approved the October 1st policy change. First, this Court follows *Jennings*, a decision of this Court and the other circuit decisions are not binding on this Court. *Roddy v. State of Tennessee*, 366 F.Supp. 33, 35–36 (E.D.Tenn. 1973). Second, the record does not reflect that CMS or HCFA was informed of the lack of MCAC's participation and, even if it were, the Sixth Circuit does not allow administrative agencies to not consider their applicable rules and regulations. *Antonuk v. United States of America*, 445 F.2d 592, 595 (6th Cir.1971)("Where Congress or administrative agencies themselves lay down procedures and regula-tions, these cannot be ignored in deference to administrative discretion.") (citations omitted). Third, judicial deference to an administrative agency's determination arises where the agency actually interprets the applicable regulation. See *Rust v. Sullivan*, 500 U.S. 173, 186–87, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991).

The Defendant cites two decisions for the contention that violations of the MCAC regulation do not warrant judicial relief, *Visiting Nurse Assoc. of North Shore v. Bullen*, 93 F.3d 997, 1010 (1st Cir.1996) and *Mississippi Hospital Assoc., Inc. v. Heckler*, 701 F.2d 511, 523 (5th Cir.1983). The First Circuit in *Bullen* did not actually decide this question: "Plaintiffs urge us to affirm the district court on another ground...[that] [b]efore implementing the final class rates in January 1994, Defendants failed to consult with a Medical Care Advisory Committee...We decline Plaintiff's request." *Id.* at 1010, n.14. The First Circuit, however, did note that "HCFA might reasonably conclude that (1) a state's failure to consult a MCAC...does not constitute a sufficient ground for disapproving a plan amendment in all circumstances." Yet, in its approval letter, CMS, HCFA's successor, did not consider the MCAC issue. Prior correspondence with HCFA to Tennessee officials reflected that there would not be an implied waiver of any applicable regulations.

Second, the *Mississippi Hospital Assn.* has been characterized as seriously in doubt in light of subsequent precedents. *Illinois Health Care Assn. v. Bradley*, 776 F.Supp. 411, 419, n. 18 (N.D.Ill.1991). As to the MCAC regulation, the Fifth Circuit conceded

> Conceivably the complete absence of an MCAC or one that is improperly constituted or exists in name only, *or in the failure to consult the committee on a fundamental policy change in a reim-*

*bursement plan, might contravene the vague requirement in 42 C.F.R. § 431.12(e)* that '[t]he committee must have the opportunity for participation in policy development and program administration, including furthering the participation of recipient members in the agency program.' 701 F.2d at 523 (quoting 42 C.F.R. § 431.12(e)) (emphasis added). This Court concludes that where, as here, there is a complete lack of any MCAC participation on the adoption of this fundamental policy change, this is the type of situation contemplated by the Fifth Circuit when the MCAC regulation should be enforced. The Court concludes that the authorities cited by the Defendant are inapposite.

Finally, the Defendant argues that under TennCare's waiver, the Defendant was not required to submit any amendment to TennCare affecting the uninsured and the uninsurables, citing paragraph 22 of the Special Terms and Conditions to TennCare waiver.

> 22. Tennessee will implement modifications to the demonstration by submitting revisions to the original proposal for HCFA approval. The State shall not submit amendments to the approved State plan relating to the new eligibles.

*Id.*

The Court concludes that the Defendant's contention on paragraph 22 is undermined by and is contrary to HCFA's correspondence with Tennessee officials. The June 17, 1996 HCFA letter made it clear that "implementing regulations...apply to both the expansion population [insured and uninsurables] and individuals who would be Medicaid eligible..." (Docket Entry No. 234, Plaintiffs' Supplemental Memorandum, Attachment thereto). The February 19, 1999 HCFA letter on the State's proposal "to close enrollment to all or any segment [y]our waiver

expansion population" stated that "changes of this magnitude...cannot be undertaken prior to our express authorization." *Id.* at Attachment No. 3.

The Defendant and his successors' letters to HCFA on amendments to TennCare affecting the insured and uninsurables, including on the October 1st policy at issue, reflect the Defendant's understanding that this type of amendment is subject to HCFA's approval under Medicaid regulations. As reflected in CMS's June 28, 2001 letter, TennCare officials repeatedly made requests to effectuate this change in TennCare coverage. This most recent letter from CMS, HCFA's predecessor, reflects that this policy coverage change was considered to be *"amendments* pertain[ing] to closing enrollment to adults in the uninsurable category." (emphasis added). These facts and HCFA's prior letters all reflect that HCFA, CMS and the State considered any policy amendments and changes on uninsurables to require federal approval.

### b. The Agreed Order and the Settlement Agreement

■■■■ The parties' agreement to settle their disputes is reflected in the "Agreed Order" (Docket Entry No. 171) that is, in effect, a Consent Decree. Consent "decrees are settlement agreements 'subject to continued judicial policing.'" *Grand Traverse Band of Ottawa and Chippewa Indians v. Director, Michigan Dept. of Natural Resources,* 141 F.3d 635, 641 (6th Cir.1998) *cert. denied* 525 U.S. 1040, 119 S.Ct. 590, 142 L.Ed.2d 533 (1998) (quoting *Vanguards of Cleveland v. City of Cleveland,* 23 F.3d 1013, 1017, 1018 (6th Cir.1994)) (citing *Williams v. Vukovich,* 720 F.2d 909, 920 (6th Cir.1983)). In addition, a consent decree must be construed 'to preserve the position for which the parties bargained.'" *Id.* at 641 (quoting *Vanguards* ). "A District Court has the

jurisdiction to enforce consent decrees." *Id.* at 641, citing *Vanguards.* Thus, the Court has jurisdiction to decide this motion.

 For governing principles on private settlement agreements, the Sixth Circuit stated that "[s]ettlement agreements are a type of contract subject to principles of state law." *Bamerilease Capital Corp. v. Nearburg,* 958 F.2d 150, 152 (6th Cir.1992). "It is well established that 'a court must enforce the settlement as agreed to by the parties and is not permitted to alter the terms of the agreement." *Brown v. County of Genesee,* 872 F.2d 169, 174 (6th Cir.1989) (quoting *Brock v. Scheuner,* 841 F.2d 151, 154 (6th Cir. 1988)); *Accord Mallory v. Eyrich,* 922 F.2d 1273, 1279 (6th Cir.1991). Yet, for a private agreement, the Court must expressly retain jurisdiction to enforce the settlement agreement and in order to conduct any further proceedings after a dismissal order. *Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 381–82, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994).[7]

 Under Tennessee law, as a matter of general contract law principles, "the ascertainment of the intention of the parties to a written contract is a question of law or judicial function for the court to perform when the language is plain, simple and unambiguous," *Petty v. Sloan,* 197 Tenn. 630, 277 S.W.2d 355 (1955); *Forde v. Fisk University,* 661 S.W.2d 883, 886 (Tenn.Ct.App.1983), "but, where the writing is not plain and unambiguous, and is such to require the aid of parol evidence, and the parol evidence is conflicting or such as admits of more than one conclusion, it is not error to submit the doubtful parts under proper instructions to the trier of fact." *Forde,* 661 S.W.2d at 886.

 Yet, ambiguity as to a contract's terms is not created because the parties disagree as to its meaning. *Oman Construction Co. v. Tennessee Valley Authority,* 486 F.Supp. 375, 382 (M.D.Tenn. 1979). One party's view of the contract does not necessarily mean that such provisions are part of the contract. *In re D.L. Bouldin Construction Co.,* 6 Bankr.288 (Bkrtcy.E.D.Tenn.1980). Tennessee law generally allows enforcement of the parties' contract as written without questioning the wisdom of the contract or the harshness of its enforcement absent some public policy consideration. *Metropolitan Life Insurance Co. v. Humphrey,* 167 Tenn. 421, 425–26, 70 S.W.2d 361, 362 (1934); *Wilson v. Scott,* 672 S.W.2d 782, 786 (Tenn.Ct.App.1984). See also, *In re Dynamic Enterprises,* 32 Bankr.509, 518 (Bkrtcy.M.D.Tenn.1983).

 Under Tennessee contract law, "modification of an existing contract cannot be accomplished by the unilateral action of one of the parties. There must be the same mutuality of assent and meeting of minds as required to make a contract." *Balderacchi v. Ruth,* 36 Tenn.App. 421, 256 S.W.2d 390, 391 (1952). Tennessee law also imposes an implied duty of good faith dealing in every contract. *Wallace v. National Bank of Commerce,* 938 S.W.2d 684 (Tenn.1996). Yet, this duty "does not extend to the formation of the contract…[nor] beyond the terms of the contract and the reasonable contractual expectations of the parties." *Id.* at 687.

The distinction between the consideration of the Consent Decree under federal law and a private settlement agreement under state law appears to be insignificant at least to the core consideration of preserving the positions bargained for by the

---

**7.** Here, the parties also agreed to file compliance reports for two years from the date of entry of the Agreed Order. (Docket Entry No. 171 at p. 11). Thus, there is an alternate basis for the Court's jurisdiction.

parties in their agreement and in accordance with its terms.

In their Agreed Order, the parties agreed to allow re-enrollment of class members who had not received adequate notice. The basic purpose of the Agreed Order was to provide due process, so as to enable them to obtain coverage under TennCare, if they met the eligibility requirements. The critical language cited by the Plaintiffs is that the State also agreed not only to reopen enrollment to uninsured adults during finite enrollment periods, but also that:

> Reopening of enrollment is a time-limited commitment, through the expiration of the current waiver or any extension period of the current waiver *under its current terms and conditions and program design*, and not to extend beyond December 31, 2002.

(Docket Entry No. 171, Agreed Order at p. 3) (emphasis added).

The Defendant argues that the phrase "current terms and conditions" refers to the terms and conditions in TennCare waiver, including paragraph 22 that allows the State to change the plan as it relates to uninsured and uninsurables without HCFA's or CMS's consent. Further, the Defendant argues that the Settlement Agreement and Agreed Order only addresses technical or procedural matters.

First, by its plain language, paragraph 2(a) of the Agreed Order refers to any changes in "program design," that clearly reflects more than technical matters. The parties' joint motion reflects the parties' Settlement Agreement was made in the context of TennCare's "policy design" and the original long-term goals of TennCare. Clearly by including "program design," the Plaintiffs sought to assure that their class members would receive coverage if eligible for TennCare under the then existing program. In addition, the Settlement Agreement on Future changes requires the State, with certain exceptions inapplicable here, to give prior notice to the Plaintiff of any "proposed *changes in policies or procedures or of any proposed new policies or* procedures that could potentially affect the waiver in which the State complies with the Settlement Agreement and Court Order in this case." (emphasis added). The Settlement Agreement's requirement of prior notice of any changes in future changes in "policies" in addition to "procedures" likewise reflects the parties' agreement to cover and discuss substantive matters in settling their dispute. To construe these paragraphs as applying only to technical or procedural matters edits out the phrases "program design" and "policies" as well as "any proposed new policies"[8] in the Agreed Order and the Settlement Agreement.

Clearly, the Settlement Agreement on prior notice of changes in "policies" also means that the Plaintiffs understood that the Defendant could make substantive changes in policy, but had to provide Plaintiffs' thirty (30) days prior notice. Accordingly, the Court concludes that when paragraph 2(a) of the Agreed Order and paragraph F. 1. of the Settlement Agreement are read together, the parties agreed that the current coverage of class members, including uninsurables, would continue, but the Defendant could not change this policy unilaterally. Plaintiffs must be given 30 days prior notice of any change in time to challenge the policy. With this construction, the Defendant breached his agreement to provide prior

---

**8.** In the Defendant's Memorandum (Docket Entry No. 230 at p. 12), the Defendant references comments of the Court that the Settlement Agreement related to only procedural matters. Those comments were made in the context of a Socratic dialogue with Plaintiffs' counsel and did not constitute the Court's conclusions on these issues.

30 days notice of policy change in Tenn-Care's program design.[9]

### c. Court's Orders

As recited earlier, this Court has issued several Orders that found that the Defendant had violated the Plaintiffs' due process rights and granted relief that included procedural rights and reinstatement. In its latest ruling on the motion to enforce the Agreed Order, the Court found, among other things that the Defendant agreed to abide by the procedural due process requirements of 42 C.F.R. § 431, Subpart E. Under this Subpart, a notice of any action by the agency affecting their claim under the Medicare program must state "the reasons for the intended action" and the "specific regulations that support...the action." 42 C.F.R. §§ 431.206(b)(2) and 431.210(b)(c).

At the hearing on the motion to enforce, Plaintiffs' proof revealed structural deficiencies in the notices to class members required by applicable rules and regulations for the TennCare. See 42 C.F.R. §§ 435.905(a) and (b). Further the proof disclosed a structural deficiency in the lack of a written protocol for Regional Mental Health Institutes ("RMHI") and Community Mental Health Centers ("CMHCs") as required by 42 C.F.R. § 435.903(a) and (b). Although Plaintiffs' proof of such noncompliance is isolated, the Court found that these structural deficiencies needed to be remedied for the protection of the due process rights of these particularly vulnerable class members. The new TennCare denial letter also needs to cite the legal authority for the denial so as to enable a meaningful appeal of the initial denial. These requirements are set forth in 42 C.F.R. Part 431, Subpart E with which the Defendant agreed to comply. (Docket Entry No. 201, Memorandum at pp. 17–20).

From the Court's perspective, it is important to understand the legal origin and predicate for Plaintiffs' rights that the Court found were violated and ordered relief. This analysis is necessary given the Defendant's argument that the Court's orders involve only procedural rights and not any substantive relief for uninsurables under TennCare.

 As a general rule, procedural due process rights are those that attend a substantive due process right or liberty interest. In *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court stated that to determine if procedural due process is required for the adverse governmental action, the Supreme Court examines the following factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335, 96 S.Ct. 893.

 Later, in *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430–31, 102 S.Ct.

---

9. The Court notes that the mere passage of thirty days from September 27th, the date the Defendant first disclosed the change to Plaintiff's counsel until October 27th will not satisfy the thirty (30) day provision. The notice under the Settlement Agreement was notice of "proposed" change in TennCare policies and program design. An ordinary reading of this provision would require a discussion of the proposal and a good faith discussion of the merits and demerits of the proposal by the parties before a final decision. In the Court's view, simply to give 30 days notice of a final policy decision does not satisfy the implied duty of good faith inherent in the parties' agreement under *Wallace,* 938 S.W.2d at 686, to discuss proposed changes before implementation, not after.

1148, 71 L.Ed.2d 265 (1982), the Supreme Court noted that "the hallmark of property ... is an individual entitlement grounded in state law which cannot be removed except for cause. Once that characteristic is found, the types of interest protected as property are varied and, as often as not, intangible, relating 'to the whole domain of social and economic fact.'" In *Logan*, the Court found a state official's failure to apply a "statutorily mandated procedure" under state law, sufficient to state a procedural due process claim under Section 1983. 455 U.S. at 431, 102 S.Ct. 1148. The concept of procedural due process arises where there "is a substantive interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona*, 461 U.S. 238, 250, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983).

TennCare's waiver is under the Social Security Act and the Defendant administers federal and state funds to provide medical benefits to eligible citizens. The Supreme Court has held that a § 1983 action can be maintained against state officials for due process violations in such instances. In *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed. 242 (1970), the Supreme Court held that a § 1983 was proper to secure noncompliance with the provisions of the Social Security Act by state officials.

> While we view with concern the escalating involvement of federal courts in this highly complicated area of welfare benefits, one that should be formally placed under the supervision of HEW, at least in the first instance, *we find not the slightest indication that Congress meant to deprive federal courts of their traditional jurisdiction to hear and decide federal questions in this field.* It is, of course, no part of the business of this Court to evaluate, apart from federal constitutional or statutory challenge, the merits or in the large or in the particu-

lar. *It is, on the other hand, peculiarly part of the duty of this tribunal, no less in the welfare field than in other areas of the law, to resolve disputes as to whether federal funds allocated to the States are being expended in consonance with the conditions that Congress has attached to their use.* As Mr. Justice Cardozo stated, speaking for the Court in *Helvering v. Davis*, 301 U.S. 619, 645, 57 S.Ct. 904, 81 L.Ed. 1307 (1937): "When [federal] money is spent to promote the general welfare, the concept of welfare or the opposite is shaped by Congress, not the states." Cf. *Lassen v. Arizona ex rel. Arizona Highway Dept.*, 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967).

397 U.S. at 422–23, 90 S.Ct. 1207 (emphasis added); *Accord Maine v. Thiboutot*, 448 U.S. 1, 6–8, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) (the Supreme Court again allowed a § 1983 action to enforce the Social Security Act).

In *Gonzalez v. Sullivan*, 914 F.2d 1197, 1203 (9th Cir.1990), the Ninth Circuit stated: "An applicant for social security benefits has a property interest in those benefits." In *Easley v. Arkansas Dept. of Human Services*, 645 F.Supp. 1535 (E.D.Ark.1986), the Court concluded that protectable interests exist in the Medicaid program.

> the plaintiffs have clearly established that their property rights to Medicaid benefits have been deprived by the Department's failure to establish the constitutionally and statutorily mandated due process safeguards of notifying Medicaid recipients of its disposition of requests for payment and an appeal process by which to challenge the disposition. Plaintiffs should be given the opportunity to challenge unfavorable

dispositions of requests for payment administratively as required by law.

*Id.* at 1545.

The Sixth Circuit held in *Wood v. Tompkins,* 33 F.3d 600, 602 (6th Cir.1994), that a Section 1983 action with procedural and substantive due process claims, was cognizable for applicants who alleged violations of the Medicare Act and regulations involving a wavier under the Social Security Act. In *Wood,* the applicants sought benefits from the "Medically Fragile Waiver" program operated by the state of Ohio under a waiver from the Secretary. *Id.* at 602. The Plaintiffs applied, but were denied benefits and at a hearing before a state official, the applicants were not allowed to introduce proof that the state's cap on home nursing services was in violation of the Medicaid Act and regulations. In *Wood,* as here, the Defendants alleged a lack of standing and failure to state a viable procedural or substantive due process claim. *Id.* at 604. In sum, without repeating the Court's sophisticated analysis, *Wood* held that the Medicare Act "conferred rights upon home care Medicaid recipients that are enforceable under § 1983" so long as the Medicaid statutory benefits at issue were "intended to benefit Plaintiffs as Medicaid recipients." *Id.* At 611.

The Sixth Circuit also entertained a Section 1983 action where "Medicaid–Eligible Enrollees" were found to have valid due process claims under Section 1983 against the defendants who managed the Tenn-Care program. *Daniels v. Wadley,* 926 F.Supp. 1305, 1306, 1311–14 (M.D.Tenn. 1996) *rev'd on other grounds* 1998 WL 211763, 145 F.3d 1330 (6th Cir.1998). Other courts have found that Medicaid recipients are entitled to protectable due process interest. See *Ortiz v. Eichler,* 794 F.2d 889 (3rd Cir.1986); *Gray Panthers v. Schweiker,* 652 F.2d 146 (D.C.Cir.1980); *Dealy v. Heckler,* 616 F.Supp. 880 (W.D.Mo.1984); *David v. Heckler,* 591 F.Supp. 1033 (E.D.N.Y.1984).

In *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the Supreme Court addressed the issue of intertwined substantive and procedural interests. In that case, the Court examined the procedures required for the "for cause" termination of nonprobationary federal employees under the Lloyd–La Follette Act. The Court stated:

> Where the focus of legislation was thus strongly on the procedural mechanism for enforcing the substantive right which was simultaneously conferred, we decline to conclude that the substantive right may be viewed wholly apart from the procedure provided for its enforcement. The employee's statutorily defined right is not a guarantee against removal without cause in the abstract, but such a guarantee as enforced by the procedures which Congress has designated for the determination of cause.

*Id.* at 152, 94 S.Ct. 1633.

The Supreme Court stated that this principle "at the very least gives added weight to our conclusion that where the grant of a substantive right is *inextricably intertwined* with the limitations on the procedures which are to be employed in determining that right, a litigant in the position of appellee must take the bitter with the sweet." *Id.* (emphasis added); *See also FDIC v. Morrison,* 747 F.2d 610, 615, n. 10 (11th Cir.1984) (citing *Arnett* and stating that "where as here both the granted right and its simultaneously imposed limitation are substantive, we cannot disregard the latter in defining the former ...").

▮ Here, the Court concludes that, applying *Arnett,* the class members' substantive rights to be considered for eligibility in TennCare are inextricably intertwined with their procedural rights

granted to class members in the Agreed Order of March 8, 2001. The Defendant, therefore, cannot by his rule act retroactively to deny uninsurables eligibility to the TennCare program, at least to the extent those individuals were members of the class covered by the Agreed Order and under other Orders of this Court.

The procedural relief granted by this Court cannot be given its proper effect if members of the plaintiffs' class no longer have the right to be considered for eligibility in the TennCare plan. The Defendant's new eligibility rule effectively eliminates the procedural relief granted in the Agreed Order and Settlement Agreement, which states that "future procedural protections" would "strengthen the TennCare program and *enhance* the procedural protections available to members of the plaintiff class." (Order, ¶ 4). If the State's rule were to take effect, those uninsurable members of the plaintiffs' class covered by the Agreed Order would only be entitled to a notice informing them that they are ineligible for TennCare. Because the right to be considered for eligibility in TennCare is intertwined with the procedural reliefs awarded in the Agreed Order, the Court holds that the State's proposed rule offends its Orders that the due process rights of the uninsurable class members have been violated.

Thus, the Court concludes that under the Medicaid Act and the TennCare regulations, as applicants for uninsurable status, Plaintiffs have a "substantive interest" in TennCare or Medicaid benefits and if they meet the program's requirements, each of the Plaintiffs has "a legitimate claim of entitlement." These facts give rise to both procedural and substantive due process rights for Plaintiffs and their class members. With this conclusion, the earlier Orders of this Court awarded not only procedural relief, but substantive relief to TennCare coverage. In a word, if

Plaintiffs' class members who are uninsurables, had received proper due process in 1999 and 2000 and were otherwise qualified for TennCare they would have received TennCare coverage prior to the effect of October 1, 2001 policy.

To allow the October 1st policy to take effect undermines completely all of the Orders of this Court to provide procedural and substantive rights to uninsurables who could have satisfied TennCare coverage requirements prior to October 1st had they gotten the opportunity to do so by receiving proper notice and having proper appeals procedures in place. To deprive the Plaintiffs' class of the benefits and rights acquired under the Order, deprives these class members of their substantive rights under a Court Order in violation of the Supremacy Clause, as discussed earlier. In this Court's view, all class members who applied or sought to apply for TennCare coverage before announcement and implementation of a proper policy change on TennCare coverage, should enjoy the benefits of the Court's earlier Orders.

### 4. Requirements for a Preliminary Injunction

With its conclusions that Plaintiffs' class members' rights have been and are being violated, the Court must consider the standards for granting a preliminary injunction.

In the Sixth Circuit, a district court considers four factors when ruling on a motion for preliminary injunction, including: "(1) whether the movant is likely to prevail on the merits; (2) whether the movant would suffer irreparable injury if the court does not grant the injunction; (3) whether a preliminary injunction would cause substantial harm to others and (4) whether a preliminary injunction would be in the public interest." *Samuel v. Herrick Memorial Hospital,* 201 F.3d 830, 832 (6th Cir.2000). *See also Blue Cross & Blue*

*Shield Mut. v. Blue Cross & Blue Shield Ass'n,* 110 F.3d 318, 322 (6th Cir.1997); *Washington v. Reno,* 35 F.3d 1093, 1099 (6th Cir.1994).

As to the likelihood of success factor, for the reasons set forth above, this factor weighs in Plaintiffs' favor on their claims for the Defendant's noncompliance with the Medicaid regulations on MCAC consultation, the breach of the notice provisions in the parties' Settlement Agreement for any policy changes and interference with the Court's Orders.

As to the impact of the preliminary injunction on others, there is evidence of a threat to the TennCare enrollment as the plan reaches its enrollment cap. Yet, the proof at the preliminary injunction hearing was that there are estimated to be 10,000 to 15,000 persons on TennCare who are unqualified for TennCare benefits. Obviously, removal of these 10,000 to 15,000 unqualified persons would ease the pressures of the enrollment cap. Reynolds testified that given the States 90 to 120 days time period for reverification, it will be late March or possibly April, 2002, before the Defendant's verification process purges these unqualified persons from enrollment. The Defendant, however, stopped its verification process in May, 2000. Since then, neither the Court's Orders nor Plaintiffs' class counsel has done anything to bar the Defendant's verification process.

42 C.F.R.431.205(d) adopts the due process standard in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970): "The hearing system must meet the due process standards set forth in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), any additional standards specified in this subpart." In *Goldberg,* the landmark due process decision on termination of government benefits, held that seven days prior notice can be constitutionally sufficient unless fair-

ness requires more time. 397 U.S. at 268, 90 S.Ct. 1011.

Under 42 C.F.R. 431.221(d), a state may allow only a reasonable time to request a hearing, not to exceed 90 days. The Defendant's process takes all the time allowed by this regulation. The Court notes the Medicaid regulations, however, require only 10 days prior to notice before termination of benefits. 42 C.F.R. § 431.211. That 10 days advance notice can be shortened, if the action to be taken is based upon probable fraud or if the facts giving rise to termination "have been verified, if possible, through secondary sources." 42 C.F.R. § 431.214(a) and (b). Under 42 C.F.R. § 431.222(a) a group hearing can be held for enrollees terminated on common grounds. Where an applicant or recipient requests a hearing, he should do so within ten (10) days. See 42 C.F.R. § 431.231(c)(2). In addition, an applicant is given fifteen (15) days to appeal an adverse decision. 42 C.F.R. § 431.232(b).

These time references are to observe that there is ample basis to expedite the verification process to remove all unqualified persons from TennCare enrollment. With this expedited resumption of reverification, there would be significantly fewer persons, i.e., 10,000 to 15,000, in the TennCare program. This reduction would reduce the cited pressures on present enrollment and may allow the inclusion of the qualified uninsurables easily within the enrollment cap. This reduction for unqualified enrollees likewise may reduce state expenditures.

The Court concludes that to serve the interests of the Plaintiffs' class as well as the Defendant's interest, the Defendant should be required to implement an expedited verification plan to reduce non-complex verifications. First, the State should provide only ten (10) days prior notice of terminations with ten (10) days thereafter

for the enrollees to respond with a request for a hearing. Within ten (10) days thereafter the Defendant's agents would hold a hearing if requested, including a group hearing for enrollees to be terminated upon common facts. Second, the hearing decision would be issued in ten (10) days after the hearing and any notice of appeal therefrom must be filed within fifteen (15) days of the date of the State's decision. Thereafter, the Commission or his designee shall render a decision in ten (10) days from the date of the notice of appeal. This expedited time frame should allow for an assessment of the enrollment cap significantly prior to February, 2002, the estimated time the enrollment cap will be met. As discussed *infra,* the Court will have a special master assess the practicability of this expedited process.

In sum, the Court is not ruling that the State can never make changes to its Tenn-Care policy as to whom it provide coverage. The Court rules only that any change must comply with the MCAC regulations and the notice provisions of the parties' Settlement Agreement, as described herein. The proposed change once properly made should not apply to persons applying before its effective date.[10]

### 5. Defendant's Motion for a Stay

As to the Defendant's motion for a stay, on October 18, 2001, the Defendant filed a motion to stay the injunction in this action citing principally a "budget crisis in state government" as well as the evidence at the hearing discussed above. To consider this motion under Fed. R.Civ.P. 62(d) the Court considers the same factors as for the issuance of an preliminary injunction, *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987), and has considered the

fact of the involvement of important state interests. *See Sampson v. Murray,* 415 U.S. 61, 84, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). The Court first adopts its finding of fact and conclusions of law in the Plaintiff's motion for preliminary injunction.

The Court has awarded relief affecting the TennCare enrollment cap and the costs of TennCare. First, as to the enrollment cap, the Defendant's verification procedure has not been utilized to address the substantial numbers of unqualified persons on the TennCare rolls, since the Defendant elected to stop verification in May, 2000. Reynolds estimates that there are 10,000 to 15,000 persons who are covered by TennCare, but are unqualified for its coverage. The 1.5 million enrollment cap would not be reached until February, 2002. The expedited reverification process under the Court's Order consistent with applicable regulations should be completed prior to that date. This reverification may also reduce costs associated with these unqualified enrollees.

As to appropriations, prior to February, 2002, the General Assembly may address with appropriations these projected overruns. Of course, the use of federal approval to resolve this crisis, as described by Mark Reynolds, has yet to be explored. If during an appeal the Court's assessment of the verification process, as ordered by the Court, is erroneous, then by February, 2002, the Defendant could seek relief from the injunction under Fed.R.Civ.P. 60(b). See *First National Bank of Salem Ohio v. Hirsch,* 535 F.2d 343, 346 (6th Cir.1976).

In addition, as to the budget crisis, as impacted by the injunction in this case, the estimated costs of the overrun for Tenn-Care is $37.5 million, of which coverage of

---

10. Of course, any class member who applied prior to the effective date of a new proper policy change, would have to prove his or her submission of an application or clear evidence of their attempts to do so prior to the policy change. Any disputes could be resolved by a Magistrate Judge or Special Master appointed by the Court for that purpose.

uninsurables is $7.5 million. Mark Reynolds, TennCare's Director, conceded at trial that the Tennessee Commissioner of Mental Health has estimated that the policy changes, that includes the change on uninsurables, may actually cost the state an additional $100 to $300 million state dollars for her department. Of course, with this policy change, the state loses $435 million in federal funds for medical treatment of its needy. The Commission on the Future of TennCare stated at to the loss of federal funds that *"not* accepting federal dollars would almost certainly result in inadequate health care for our most fragile Tennessee citizens— an unacceptable alternative." Defendant's Exhibit No. 9 at p. 2 (emphasis added). Finally, if this policy is not enjoined, this Court's Orders will be superseded. Finally, from the proof, if a stay were granted class members would likely suffer and die from lack of necessary medications for their serious medical needs. Thus, the Court concludes that the Defendant's motion for stay should be denied.

### 6. Special Master

Pursuant to Fed R Civ Pro 53(a) the Court deems the appointment of a special master necessary at this time to monitor the relief ordered by the Court. The history of this litigation reveals failed promises by the defendant to comply with express Orders of this Court on issuance of notices and terminations of coverage consistent with due process principles. Thus far, Plaintiffs have filed five motions citing the Defendant's failures to comply with Court Orders (Docket Entry Nos 87, 92, 112, 184, and 204), all of which resulted in additional remedial relief. These Orders are in addition to the Court's first preliminary injunction in this case. This court has also awarded injunctive relief against the Defendant in other TennCare cases, such as *Hamby* and *Daniels.*

Under Rule 53(a), a district court, on its own motion, can appoint a special master in complex or specialized litigation involving large amounts of information or technical matters of substantial volume. See James William Moore, Moore's Federal Procedure § 53.04[c]. Here, the Court's remedial Order requires an issuances of notices to tens of thousands of TennCare enrollees who are class members. This expedited reverification process contemplated by Court's latest order will likely require a computer consultant on data systems to assist in the notice process. In the Court's view, these two factors on the scope of the class and the technical assistance necessary to provide notice are exceptional circumstances that satisfy the standards for this appointment. *See McCormick v. Western Kentucky Navigation Inc.,* 993 F.2d 568, 570 (6th Cir.1993), and *In re United States,* 816 F.2d 1083, 1089–90 (6th Cir.1987).

The Special Master's functions, at this time, shall be to monitor compliance with the Court's Orders, to implement the reverification process ordered by the Court, and to report to the Court any significant factors that warrant the Court's further attention to achieve these goals.

Given the importance of the reverification process, the parties have five (5) days from the date of this Order to submit either an Agreed Order on a qualified and available person to appoint as a Special Master or to submit three (3) nominees with a statement of their qualifications and availability. The Court will hold a conference as soon thereafter as practicable to discus the implementation of the reverification process contemplated by the Court.

An appropriate Order is filed herewith.

### *ORDER*

In accordance with the Memorandum filed herewith and pursuant to Fed.

R.Civ.P. 65(d), it is hereby **ORDERED** that the Defendant and all other persons acting in concert with him are hereby **PRELIMINARILY ENJOINED** from the enforcement of the October 1, 2001 amendment to the TennCare plan that would have excluded from eligibility class members and future applicants who would have or will apply for TennCare coverage as uninsurables. This preliminary injunction shall be enforced pending any further order of this Court or the Sixth Circuit Court of Appeals.

The Defendant's motion for a stay pending an appeal (Docket Entry No. 247) is **DENIED** for the reasons stated in the Memorandum. Under Fed.R.Civ.P. 53(a) through (c), a Special Master will be appointed to perform the duties assigned by the District Court including, monitoring compliance with the Court's Orders on notices to class members, implementing the reverification process ordered by the Court, and reporting to the Court any significant factors that warrant the Court's further attention to achieve these goals.

Given the importance of the reverification process, the parties have five (5) days from the date of this Order to submit either an Agreed Order on a qualified and available person to appoint as a Special Master or to submit three (3) nominees with a statement of their qualifications and availability. The Court will hold a conference as soon thereafter as practicable to discus the appointment of the Special Master and the implementation of the reverification process contemplated by the Court.

It is so **ORDERED.**